**Affirmed and Opinion Filed April 29, 2022**



**In the**

**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-21-00724-CV**
_____

**CITY OF DALLAS, Appellant**
**V.**
**RIVER RANCH EDUCATIONAL CHARITIES, Appellee**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-04828**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Carlyle, and Garcia
Opinion by Justice Carlyle

The City of Dallas appeals the trial court's denial of its plea to the jurisdiction filed in response to counterclaims brought against it by River Ranch Educational Charities (RREC or River Ranch), a Texas non-profit corporation. The City generally contends the trial court erred by denying its plea because RREC's counterclaims are based on the City's engagement in a governmental function and do not fall within any waiver of governmental immunity from suit. We affirm the trial court's order in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

# Background

The City filed this lawsuit against RREC in April 2019 seeking declaratory and injunctive relief pertaining to the Texas Horse Park (THP). According to the City's petition, THP opened in 2014 and is "a component of the City's Trinity River Corridor Project, an urban renewal plan undertaken by the City to provide flood control improvements, recreational amenities, environmental protection, and economic development opportunities within the Trinity River Corridor."

The City asserted that in 2012, it entered into a contract with RREC titled "Development and Operations Agreement with River Ranch for the Texas Horse Park" (the contract or the agreement), under which "RREC was authorized to provide equine-related recreational activities at the horse park for Dallas residents and others." The City's petition stated:

> 14. [THP] is owned by the City. In the Agreement, the City and RREC agreed that RREC would operate and maintain the area designated as Premises B at the Texas Horse Park and would provide equine-related services to the public there. . . . RREC has allegedly occupied Premises B since its operations began under the Agreement. The City did not convey an interest in the real property to RREC in the Agreement, and the Agreement did not provide for the payment of rent by RREC. The initial term of the Agreement was 21 years, with two 5-year renewal period options.
>
> 15. The Agreement obligated the City to design and construct the Texas Horse Park. In order to meet this obligation, the City agreed to "contribute no more than $12 million from the 2006 Bond Funds for the development of the Texas Horse Park."

Starting in 2014, the City sent RREC multiple notices of contract violations, including unauthorized vegetation and tree removal, improper construction in

floodplain areas, and failure to maintain required insurance coverage. In December 2018, the City notified RREC it was terminating the contract because RREC's violations constituted default. RREC refused to vacate THP and continued its operations. The City's petition sought to enjoin RREC from occupying Premises B and requested a declaration regarding the contract's termination.

RREC filed a general denial answer and asserted counterclaims for breach of contract, breach of implied duty of cooperation and non-interference, fraud, and declaratory judgment. RREC's pleading contended the City "in its management of the Texas Horse Park was and is performing a proprietary function" and "has no governmental immunity or in the alternative has waived any such immunity" as to RREC's claims.

The City generally denied RREC's counterclaims and filed a June 2021 verified plea to the jurisdiction asserting governmental immunity. The City contended:

> The Agreement contemplates that RREC will operate its program with oversight from the City and will meet certain requirements for participation. . . . The City entered into the Agreement to obtain a partner to operate Premises B of the Texas Horse Park as a recreational facility within the parameters set out by the City, not to simply lease the land to a private party to carry out its own business in whatever manner it chose. It was done as part of the City's governmental functions related to parks and zoos and recreational facilities, and therefore, the City is entitled to governmental immunity as to RREC's claims in this litigation.

The City argued that because it is entitled to governmental immunity and RREC did not plead a valid waiver of that immunity, RREC's claims should be dismissed with prejudice for lack of jurisdiction. The exhibits attached to the plea to the jurisdiction included the contract[1] and a May 22, 2013 Dallas City Council resolution authorizing THP's construction.

---

[1] The contract stated, among other things:

> THIS AGREEMENT ("Agreement") for the development, operation, and maintenance of an equestrian center is entered into . . . between [the City] and [River Ranch].
>
> WHEREAS, City is presently undertaking the Trinity River Corridor Project that will provide economic development opportunities along the Trinity River Corridor and . . . a component of the Trinity River Corridor Project is the development of an equestrian center, (the "Texas Horse Park"); and
>
> WHEREAS, the Texas Horse Park will be located on the real property owned by the City and described on Exhibit B . . . ; and
>
> WHEREAS, River Ranch is a Texas non-profit corporation organized and existing under Texas law for the purpose of empowering, enriching, and educating special needs and underprivileged children and adults in the Dallas area through equine-related activities; and
>
> WHEREAS, City will be designing and constructing the Texas Horse Park and the parties desire for River Ranch to provide equine-related recreational activities and services for the citizens of Dallas; and
>
> WHEREAS, River Ranch will operate its program at its own cost and maintain and manage a portion of the Texas Horse Park as discussed in this Agreement;
>
> NOW, THEREFORE, City and River Ranch . . . do hereby agree as follows:
> . . . .
> **Section 2.1.** **Purpose.** The purpose of this Agreement is to set forth the terms and conditions upon which City will design and construct the Texas Horse Park and City will allow River Ranch to provide equine related services and operate and maintain Premises B as discussed herein. For purposes of this Agreement, any reference to River Ranch's operations will include operations and management of not only Premises B but also other locations at the Texas Horse Park where River Ranch will be operating and managing its services ("River Ranch's Operations"). River Ranch covenants to operate and maintain Premises B as herein provided. City shall not be responsible for any of the costs of such operation and maintenance during the Term of this Agreement.
> . . . .

**Section 6.2. Uses.** River Ranch shall operate and maintain Premises B for the purposes described in this Agreement to be used and enjoyed by the citizens of Dallas and its visitors, including horse-back riding, community outreach programs, educational and enrichment activities, and other related activities providing access to children with special needs.

. . . .

**Section 8.2. River Ranch's Management and Operations at the Texas Horse Park.** River Ranch shall do all things and take all actions necessary and or appropriate for the operation, maintenance, and management of Premises B and River Ranch's operations at the Texas Horse Park in accordance with this Agreement. Without limiting the generality of the foregoing, River Ranch shall:

(a) pay all management, maintenance (including major maintenance), repair, and operating expenses for Premises B, and all other costs of River Ranch's operations;

. . . .

(e) provide a manager to supervise and be responsible for overseeing River Ranch's operations;

. . . .

(x) provide programs for Dallas citizens, particularly children with special needs and underprivileged children and seniors;

. . . .

**Section 8.13**. **Contracts Related to Management and Operation: General Provisions.**
(a) Subject to the terms of this Agreement, River Ranch, at no cost to the City, shall be the exclusive manager and operator of Premises B after City's receipt of certificate of occupancy and River Ranch commencing its operations at the Texas Horse Park with sole responsibility for, and full control and discretion in, the operation, direction, management, and supervision of River Ranch's operations. . . . .

. . . .

**Section 8.14**. **Contracting Operations - Marketing.** River Ranch shall, at its cost and expense, plan, prepare, implement, coordinate and supervise all advertising, marketing, public relations and other promotional programs for River Ranch's operations. River Ranch shall also negotiate, execute (in its own name and not the name of City) and perform all promotions and contracts concerning the sale, promotion, marketing and use of trademarks, trade-names, logos and similar intellectual property rights relating to River Ranch's operations; (but in no event or circumstances shall include "Dallas", "City of Dallas" or other city egos without express written consent of the Director) . . . .

. . . .

**Section 10.17. Relationship of the Parties.** River Ranch's status shall be that of an independent contractor and not an agent, servant, employee, or representative of City in the performance of the Services. . . . No term or provision of this Agreement or act of River Ranch in the performance of this Agreement shall be construed as making River Ranch the agent, servant or employee of the City . . . .

The contract also required RREC to (1) maintain a specified minimum balance in its operating accounts; (2) authorize the City to audit its accounts and financial records at any time; (3) submit annual operating budgets and plans for approval by the "Director of the Trinity Watershed Management," "which approval shall not be unreasonably withheld"; (4) permit the City to use Premises B for up to six days per year at no charge except reimbursement for RREC's personnel and utility costs; and (5) provide a specified percentage of its riding lessons, trail rides, and other programs to low income and underprivileged Dallas residents. Following the contract's initial execution, the parties amended it several times.

RREC filed a response to the plea to the jurisdiction reasserting its contentions that governmental immunity is inapplicable because the City is "engaged in a proprietary function at the THP" or, alternatively, that any immunity has been waived. RREC argued, among other things, (1) THP is not a park or recreational facility as enumerated in the Texas Tort Claims Act, *see* TEX. CIV. PRAC. & REM. CODE § 101.0215(a); and (2) under the analysis set out in *Wasson Interests, Ltd. v. City of Jacksonville* (*Wasson II*), 559 S.W.3d 142, 149 (Tex. 2018), the City was engaged in a proprietary function when it entered into the contract. RREC asserted (1) though "horse park" is defined in the Dallas Development Code (DDC) as "an equestrian facility that provides educational, recreational, and therapeutic opportunities to the public," DDC § 51A-5.104(4) "specifically designates RREC as a private recreation club and area, not a public park"; (2) the City "has never considered THP to be a park, zoo or recreation center, and this is reflected in the fact that it is not listed on Dallas Parks Inventory Master Spreadsheet"; and (3) the contract described RREC as the "operator" of the equestrian center and gave it "sole responsibility" for numerous designated functions and "the right to develop, operate and maintain the equestrian center subject to the Agreement."

The exhibits attached to RREC's response included the contract; the City's notices of default and termination; a declaration of RREC's manager; RREC's certificate of occupancy; a "Dallas Parks Inventory Master Spreadsheet" from the Dallas Park and Recreation Department's website; portions of the DDC; and various

–6–

Dallas City Council meeting documents, including briefing materials pertaining to a 2012 "Texas Horse Park Project Update." The 2012 briefing materials stated (1) THP "is an equestrian facility developed in partnership with the community for education, recreation, competition, and conservation"; (2) THP will "benefit the City of Dallas and its citizens economically, educationally, culturally, recreationally, and ecologically"; (3) in 2012, the City issued a "Request for Proposal" for a private operator; (4) the City subsequently received letters of interest from three non-profit entities, including RREC; and (5) the non-profits "would provide community services and maintenance as their rent."

Following a hearing,[2] the trial court signed an order denying the plea to the jurisdiction without stating the basis for its ruling.

### Standard of review and applicable law

We review a trial court's order denying a jurisdictional plea based on governmental immunity de novo. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). In performing our de novo review, we consider only the pleadings and evidence pertinent to the jurisdictional inquiry. *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). We take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any

---

[2] The day before the hearing, the City filed a reply in support of its plea to the jurisdiction. On the date of the hearing, RREC filed a response to the reply and the City filed a reply to that response. At the hearing, the trial court stated it would not consider those documents because they were not timely filed.

doubts in the nonmovant's favor. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).

To invoke the trial court's subject-matter jurisdiction, the plaintiff must allege facts that affirmatively demonstrate the court has jurisdiction to hear the case. *Id*. at 226. A plea to the jurisdiction that disputes the existence of jurisdictional facts asserts in essence that the evidence conclusively negates the existence of the relevant jurisdictional facts. *Id*. at 227–28. "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id*. However, if the evidence related to the jurisdictional issue is undisputed or fails to raise a fact question as to jurisdiction, the trial court rules on the plea to the jurisdiction as a matter of law. *Id*. at 228.

Municipal corporations such as the City exercise their broad powers through two different roles: proprietary and governmental. *Wasson II*, 559 S.W.3d at 146. Immunity protects municipalities from suit based on the performance of a governmental function barring an express, statutory waiver of immunity. *IT-Davy*, 74 S.W.3d at 853. In contrast, when a municipality embarks on a proprietary function, it is subject to the same duties and liabilities as those incurred by private persons and corporations and is not immune from suit. *Wasson II*, 559 S.W.3d at 146.

The Texas Tort Claims Act (TTCA) defines and enumerates governmental and proprietary functions for the purpose of determining whether immunity applies to

tort claims against a municipality. *See* TEX. CIV. PRAC. & REM. CODE § 101.0215. The TTCA defines governmental functions as those "that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." *Id*. § 101.0215(a). Section 101.0215(a) provides a non-exclusive list of thirty-six governmental functions, including "parks and zoos" and "recreational facilities, including but not limited to swimming pools, beaches, and marinas." *Id*. § 101.0215(a)(13), (23). The TTCA defines proprietary functions as those "that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality." *Id*. § 101.0215(b). Section 101.0215(b)'s non-exclusive list of propriety functions includes, among other things, "amusements owned and operated by the municipality" and "any activity that is abnormally dangerous or ultrahazardous," though proprietary functions do not include any of the TTCA's enumerated governmental functions. *Id*. § 101.0215(b)–(c).

To determine the boundaries of governmental immunity in a breach of contract case, we must consider the relevant statutory provisions as well as the common law. *Wasson II*, 559 S.W.3d at 147–48. We are to "aid our inquiry" by looking to the TTCA's definitions and designations for governmental and proprietary functions. *Id*. at 148–49 (citing *Wasson Interests, Ltd. v. City of Jacksonville* (*Wasson I*), 489 S.W.3d 427, 439 (Tex. 2016)). If a function is designated in § 101.0215 as governmental, we have no discretion to determine it is proprietary. *City of Carrollton*

–9–

*v. Weir Bros. Contracting, LLC*, No. 05-20-00714-CV, 2021 WL 1084554, at *3 (Tex. App.—Dallas Mar. 22, 2021, pet. denied) (mem. op.). If a function is not designated in that section as either governmental or proprietary, we apply the section's general definitions and the considerations set out in *Wasson II* to determine the nature of the activity. *Id*.; *see Wasson II*, 559 S.W.3d at 150. The *Wasson II* considerations are (1) whether the City's act was mandatory or discretionary, (2) whether the act was intended to benefit the general public or the City's residents, (3) whether the City was acting on the State's behalf or its own behalf, and (4) whether the City's act was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary. *Wasson II*, 559 S.W.3d at 150. The focus "belongs on the nature of the contract" at the time it was entered into. *Id*. at 149.

### Analysis

We begin with the City's second issue, in which it contends it has governmental immunity from RREC's counterclaims "because the Texas Horse Park is part of the City's governmental functions related to parks and recreational facilities." The City asserts (1) "undisputed facts establish that the City created, designed, built, and controls the Texas Horse Park, which is defined by the Dallas City Code as 'an equestrian facility that provides educational, recreational, and therapeutic opportunities to the public,'" and (2) the City "is entitled to governmental immunity as to its activities related to the Texas Horse Park because

its lease of a portion of the Texas Horse Park to River Ranch specifically so that River Ranch may provide equestrian activities under the City's oversight falls within the City's park and recreational activities government function."

A municipal park has been defined as "a place where the public generally may go for various kinds of recreation and amusement." *Lewis v. City of Fort Worth*, 89 S.W.2d 975, 978 (Tex. 1936). The DDC states "HORSE PARK means an equestrian facility that provides educational, recreational, and therapeutic opportunities to the public." DALLAS, TEX., CITY CODE § 51P-883.103(a)(4). But the DDC's § 51P-883.117(a) states a "horse park" is "considered a private recreation club or area for the purposes of Section 51A-5.104," which pertains to improvements permitted in flood plains. *Id*. § 51P-883.117(a). RREC's certificate of occupancy states "Land Use Designation: PRIVATE RECREATION CENTER, CLUB, OR AREA." Also, the "Dallas Parks Inventory Master Spreadsheet" described above does not list THP as a park. We agree with RREC that the evidence raises a genuine issue of material fact as to whether THP falls under § 101.0215(a)'s "parks and zoos" function. *See* TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(13).

Additionally, RREC argues:

> To have immunity under the TTCA, . . . . it is not enough for the property to be classified as a recreational facility. The City must also be the operator of the facility. As this Court recently explained in *City of Carrollton v. Weir*, the City cannot contract with a third party to run a recreational facility, and then slip under that third party's umbrella to claim that the City itself is engaged in the governmental function of operating a recreational activity.

–11–

In *Weir Brothers*, the City of Carrollton published a "Request for Proposal" for the lease or sale of a certain piece of real property and set forth items and criteria it would consider when evaluating the bids. *Weir Bros.*, 2021 WL 1084554, at *1. The items and criteria included, among other things, the "extent to which the goods or services meet the municipality's needs" and the "degree to which the proposed project would enhance or complement the McInnis Sports Complex." *Id.*

The City ultimately executed a lease agreement with Blue Sky Sports Center of Carrollton under which Blue Sky agreed to lease approximately thirty acres of the property to "operate a multi-use sports, recreational, entertainment, and related service facility." *Id.* The facility could include, among other things, indoor and outdoor soccer fields, concession stands, volleyball facilities, a miniature golf and entertainment center, batting cages, and "any and all reasonably related activities." *Id.* The lease required the facilities to be open to the public "during reasonable times as is customary for [Blue Sky's] type of business" and permitted Blue Sky to charge fees for the facilities' use. *Id.* The lease also allowed the City to "reasonably use and occupy the Leased Premises up to two times per calendar year" and provided that the City and Blue Sky would develop a cooperative schedule annually to allow for the City's use. *Id.*

Subsequently, the City entered into a contract for grading of the property, which it later terminated. Weir Brothers Contracting, which had performed some of

–12–

the grading work as a subcontractor, acquired an assignment of the contractor's claims and sued the City for breach of contract, quantum meruit, promissory estoppel, and tortious interference with contract. *Id*. at *2. The City filed a plea to the jurisdiction based on governmental immunity, which the trial court denied. On appeal, this Court affirmed the denial. This Court stated:

> The City attempts to characterize its lease as an enumerated governmental function based on Blue Sky's use of the property to build and operate a recreational facility. Recreational facilities are among the governmental functions listed in section 101.0215. . . . The fundamental flaw in the City's argument is that Blue Sky's construction and operation of a recreational facility is not a function of the City. Nor is it a function performed by Blue Sky on the City's behalf. The right to operate, manage, and control the sports complex belongs entirely to Blue Sky.

*Id*. at *3. This Court held it would not attribute Blue Sky's function of operating a sports complex to the City for the purpose of determining whether the City's actions were governmental in nature. *Id*. at *4. This Court also stated, "Because neither leasing nor grading property is listed as a governmental or proprietary function in section 101.0215, the general definitions of those functions control our determination of the capacity in which the City was acting when it engaged in the conduct at issue." *Id*. at *4. Then, this Court applied the *Wasson II* factors and concluded the trial court did not err by denying the City's plea to the jurisdiction. *Id*. at *5.

Here, the City contends *Weir Brothers* is distinguishable because (1) "unlike in *Weir Brothers*, the City did not put out a general request for proposals to lease

–13–

land"; (2) THP "is not a business being operated by River Ranch under a lease with the City"; and (3) "[r]ather River Ranch is providing its equestrian services on a portion of the Texas Horse Park through its agreement with the City," which "provides for City oversight and control over River Ranch's operations on Premises B."

We disagree with the City's position that the reasoning of *Weir Brothers* is inapplicable. In both cases, the cities expressed concepts for use of the respective premises and issued requests for proposals consistent with those concepts. Though the contract before us does not contain the term "lease," the record shows the City contemplated RREC would "provide community services and maintenance as their rent." Additionally, though the contract provides for certain auditing and approvals by the City, it also states (1) River Ranch "will operate its program at its own cost and maintain and manage a portion of the Texas Horse Park as discussed in this Agreement"; (2) River Ranch "shall do all things and take all actions necessary and or appropriate for the operation, maintenance, and management of Premises B and River Ranch's operations at the Texas Horse Park in accordance with this Agreement," including "provide a manager to supervise and be responsible for overseeing River Ranch's operations"; (3) subject to the contract's terms, "River Ranch, at no cost to the City, shall be the exclusive manager and operator of Premises B . . . with sole responsibility for, and full control and discretion in, the operation, direction, management, and supervision of River Ranch's operations"; (4) River

–14–

Ranch's promotional materials "in no event or circumstances shall include 'Dallas', 'City of Dallas' or other city logos without express written consent of the Director"; and (5) "River Ranch's status shall be that of an independent contractor and not an agent, servant, employee, or representative of City in the performance of the Services." These provisions raise a genuine issue of material fact as to operation, management, and control. *See Weir Bros.*, 2021 WL 1084554, at \*3.

On this record, we conclude the trial court did not err by not attributing RREC's function of operating an equestrian facility to the City for the purpose of determining whether the City's actions were governmental in nature. *See id.*; *see also Miranda*, 133 S.W.3d at 227–28. Because the record does not establish the City was performing a § 101.0215(a) enumerated function, we next examine whether the City's act of contracting with RREC was a governmental function under the TTCA's general definitions and *Wasson II*. *See Weir Bros.*, 2021 WL 1084554, at \*4.

As in *Weir Brothers*, the City here "makes no argument in its brief on appeal that its actions would fall under the general definition of a governmental function," nor does the City address application of the *Wasson II* factors. *See id.* at \*5. The record does not show the City's decision to contract with RREC regarding Premises B was a "mandatory" act or that the City was acting on the State's behalf. *See Wasson II*, 559 S.W.3d at 150. Additionally, the contract (1) stated the City "will be designing and constructing the Texas Horse Park and the parties desire for River Ranch to provide equine-related recreational activities and services for the citizens of Dallas,"

(2) permitted the City to use Premises B for up to six days per year at no charge except reimbursement for RREC's personnel and utility costs, and (3) required RREC to "provide a specified percentage of its riding lessons, trail rides, and other programs to low income and underprivileged Dallas residents." The 2012 Dallas City Council briefing materials stated THP will "benefit the City of Dallas and its citizens economically, educationally, culturally, recreationally, and ecologically." Thus, at the very least, the evidence raises a fact issue as to whether the City acted "primarily for the benefit its residents." *See Weir Bros.*, 2021 WL 1084554, at *5.

As to the remaining *Wasson II* consideration, "[t]he fact that a city's proprietary action 'touches upon' a governmental function is insufficient to render the proprietary action governmental." *Wasson II*, 559 S.W.3d at 153. "Instead, a city's proprietary action may be treated as governmental only if it is essential to the city's governmental actions." *Id*. The TTCA enumerates "parks and zoos" and "recreational facilities" as governmental functions, but does not mention equine activities. Also, the record shows RREC operated only a portion of THP. The City does not address whether or how its act of contracting with RREC was "essential" to a governmental action. On this record, we conclude the evidence did not establish the City's act of contracting with RREC was a governmental function. *See id.*; *see also City of League City v. Jimmy Changas Inc.*, 619 S.W.3d 819, 827 (Tex. App.— Houston [14th Dist.] 2021, pet. filed) (concluding trial court did not err by determining governmental immunity did not apply where city provided no argument

on fourth *Wasson II* factor and there was some evidence under other three factors to support proprietary nature of act); *City of Helotes v. Page*, No. 04-19-00437-CV, 2019 WL 6887719, at \*4 (Tex. App.—San Antonio Dec. 18, 2019, pet. denied) (mem. op.) (same). In light of our conclusions above, we need not address the City's remaining issues, which allege error regarding waiver of governmental immunity.[3]

\*    \*    \*

The trial court did not err by denying the City's plea to the jurisdiction. We affirm the trial court's order.

/Cory L. Carlyle/

210724f.p05

CORY L. CARLYLE
JUSTICE

---

[3] During oral submission before this Court, the City argued for the first time that even if governmental immunity is inapplicable here, the trial court lacked jurisdiction over RREC's contract claims because RREC did not give pre-suit notice as required under Dallas City Code § 2-86. *See* DALLAS, TEX., CITY CODE § 2-86 ("Notice Required for Certain Breach of Contract Claims"). In a previous case involving § 2-86, this Court held the city code section was not a jurisdictional prerequisite, stating, "Section 311.034 provides that '[s]tatutory prerequisites to suit, including the provision of notice, are jurisdictional in all suits against a governmental entity.' But the notice provision here is not a statutory requirement; rather, it is contained in the city code." *Romulus Grp., Inc. v. City of Dallas*, No. 05-16-00088-CV, 2017 WL 1684631, at \*6 (Tex. App.—Dallas May 2, 2017, pet. denied) (mem. op.).

The City asserts that a subsequent Texas Supreme Court opinion effected an "intervening change in the law" regarding that conclusion, citing *San Antonio River Authority v. Austin Bridge & Road*, 601 S.W.3d 616 (Tex. 2020). In *Austin Bridge*, our supreme court concluded Texas Local Government Code Chapter 271 authorized the River Authority to agree to arbitrate disputes arising from its construction contract with Austin Bridge. *Id*. at 631. That case did not address or mention a city code notice provision or *Romulus*. Assuming without deciding that the City's newly asserted § 2-86 argument is properly before us, we reject that argument. *See Romulus*, 2017 WL 1684631, at \*6.

–17–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CITY OF DALLAS, Appellant

No. 05-21-00724-CV     V.

RIVER RANCH EDUCATIONAL
CHARITIES, Appellee

On Appeal from the 14th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-19-04828.
Opinion delivered by Justice Carlyle.
Justices Pedersen, III and Garcia
participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee RIVER RANCH EDUCATIONAL CHARITIES recover its costs of this appeal from appellant CITY OF DALLAS.

Judgment entered this 29th day of April, 2022.